**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

COMMUNICATIONS UNLIMITED,  )
CONTRACTING SERVICES, INC.,  )
et al.,  )
 )
      Plaintiffs,  )
 )
   v.  )      No. 4:16-CV-00516-AGF
 )
BROADBAND INFRASTRUCTURE  )
CONNECTION, LLC, et al.,  )
 )
     Defendants.  )

## MEMORANDUM OPINION

     This matter is before the Court on Plaintiffs' motion for entry of judgment (ECF No. 299) after a bench trial on Plaintiffs' claims for indemnification and contribution in this insurance coverage dispute.  For the reasons set forth below, judgment will be entered for Plaintiffs.

### SUMMARY

     Plaintiffs are Communications Unlimited Contracting Services, Inc. (CUI)[1] and its insurers, Charter Oak Fire Insurance Company and St. Paul Fire & Marine Insurance Company (together "Travelers"[2]).  Defendant is Mid-Continent Casualty Company, as insurer for dismissed defendant Broadband Infrastructure LLC, now defunct.

     CUI is in the business of performing field labor services for cable providers such as Charter Communications.  In early 2012, CUI engaged Broadband to provide personnel and

---

[1]     As explained in the Court's ruling at the summary judgment stage (ECF No. 144), Communications Unlimited Contracting Services is one of three companies comprising a joint venture under the brand name Communications Unlimited, Inc. (CUI).  For simplicity, the Court refers to this Plaintiff as CUI.

[2]     Travelers is an insurance group that includes Charter Oak and St. Paul. They refer to themselves jointly as Travelers.

equipment to support CUI's operations pursuant to a subcontracting agreement.  The agreement obligated Broadband to indemnify CUI for any losses stemming from Broadband's performance. To guarantee that obligation, Broadband obtained liability insurance from Defendant Mid-Continent naming CUI as an additional insured.

In the St. Louis cable market, CUI and Broadband worked closely together in a single facility leased and managed by CUI.  In November 2011, Broadband hired Robert Sebring as facility manager, which, among other responsibilities, entailed interviewing and hiring Broadband employees.  In the spring of 2012, Sebring was transferred to CUI's payroll, though he continued to interview and hire employees for Broadband.  That fall, Sebring hired James Helderle for a position as a cable technician.  During Helderle's second week of employment, he went on a service call to the residence of Charter customer Jane Doe.  Helderle asked Doe personal questions during the visit and later texted her to ask her out for drinks.  Doe complained to Charter, and Helderle was promptly terminated.  The following night, he returned to Doe's home and depravedly assaulted her.

In February 2015, Doe filed a lawsuit in state court against Charter, CUI, Broadband, and Helderle, alleging that the corporate defendants were Helderle's joint employers and asserting claims of negligent hiring, negligent supervision, and negligent failure to warn.  Plaintiffs tendered the claim to Mid-Continent for defense and indemnification, but Mid-Continent rejected the demand.  In January 2016, CUI and Charter reached a confidential settlement with Doe.  CUI was contractually obligated to indemnify Charter for this loss, so Travelers funded most of the settlement payment and defense costs.  Broadband settled with Doe separately for a lesser amount.

2

In April 2016, Plaintiffs filed this action to recover their losses from Broadband and Mid-Continent.  In Count I, CUI sought indemnification from Broadband for the full amount of the Doe settlement plus attorney fees and expenses.  In Count II, CUI asserted a claim of breach of contract against Mid-Continent for refusing to defend Doe's suit against CUI as an additional insured.  In Count III, Travelers asserted a claim against Mid-Continent for equitable contribution to recover all amounts paid on CUI's behalf.

In February 2017, Mid-Continent filed a counterclaim against CUI seeking indemnification for Mid-Continent's costs in defending and settling Doe's claims against Broadband.  The Court granted partial summary judgment in CUI's favor on Mid-Continent's counterclaim on the basis that it was barred by the Missouri settlement statute, Mo. Rev. Stat. § 537.060.  ECF No. 85.  In June 2018, the parties filed four cross-motions for summary judgment, which the Court denied because the legal questions of indemnification and contribution hinged on a factual dispute as to which company actually hired and employed Helderle: Broadband, CUI, or both.  ECF No. 144.

To resolve that factual dispute, a jury trial was held in April 2019.  On the eve of trial, Broadband and Mid-Continent moved to sever CUI's claim against Broadband (Count I) to avoid the jury's conflation of Broadband's indemnity obligations with Mid-Continent's coverage obligations, representing that any eventual judgment would be paid entirely by Mid-Continent.  CUI agreed to dismiss Count I, provided that the dismissal would have no preclusive effect on Plaintiffs' ability to recover all losses from Mid-Continent.  The parties filed a joint stipulation to that effect (ECF No. 201) and proceeded to trial on the discrete factual question that would inform the Court's resolution of the legal issues in this subsequent phase of litigation.

At the conclusion of trial, the jury answered two special interrogatories tailored to the issues the Court would need to decide. Specifically, the jury was asked to determine whether Helderle was an employee of (a) Broadband or (b) both Broadband and CUI, or neither (a) nor (b). A similar question was posed regarding on whose behalf Sebring was acting when he hired Helderle. The jury found that Helderle was employed by Broadband or both companies and that Sebring hired Helderle on behalf of Broadband or both companies. Based on these factual findings, the remaining legal issues now before the Court involve whether and to what extent Mid-Continent's insurance policies cover Plaintiffs' losses, which the parties agreed would be determined in a separate bench trial. That bench trial was held on October 22, 2020, and the matter has been fully briefed.

Based on the evidence and arguments presented, the Court finds that Broadband agreed to indemnify CUI, and CUI's liability to Doe arose out of Broadband's "ongoing operations" as defined in Mid-Continent's policy. As such, Mid-Continent had a duty to defend and indemnify CUI in connection with the Doe settlement. Consequently, Plaintiffs are entitled to recover from Mid-Continent all amounts incurred in defending and settling Doe's claims against CUI and Charter, with prejudgment interest from June 29, 2017. Plaintiffs are not entitled to recover defense costs incurred on behalf of Charter or their own costs incurred in litigating Mid-Continent's counterclaim in the present action.

In accordance with Rule 52(a), the findings and conclusions below cover the entire case. A separate judgment will be entered under Rule 58.

# FINDINGS OF FACT

## Master Contractor Agreement

In 2007, Charter engaged CUI as a contractor pursuant to a Master Contractor Agreement ("MCA").  In addition to describing CUI's duties in the field, the MCA obligates CUI to indemnify Charter against any claim seeking damages for bodily injury caused by, connected with, or related to the actions or omissions of CUI or its subcontractors:

> 10.1 Contractor shall indemnify, defend, reimburse and hold Charter, its officers, directors, representatives, employees, the administrators of Charter's benefit plans and affiliates, harmless from, for and against any and all suits, claims, actions, losses, expense, costs (including without limitation reasonable attorneys' fees and court costs), fines, levies, awards, penalties, damages and/or other liability (direct or indirect) arising from, related to, or based upon:
>
> > 10.1.1 actual or alleged injury (including death) to any persons . . . that may occur, which is caused by, connected with or related to . . . the actions or omissions of Contractor, its employees, licensees, invitees, designees or subcontractors; . . .

## Master Service Agreement

In February 2012, CUI and Broadband entered into a Master Service Agreement ("MSA") governing their subcontracting arrangement in service to CUI clients like Charter.  In the MSA, CUI is referred to as the "Company" and Broadband is the "Contractor."

Section 3 of the MSA states that Broadband is responsible for providing field labor services to CUI's clients at the direction of CUI:

> **3. Agreement to Perform Work; Key Personnel.**
>
> **(a) Agreement to Perform Work.** During the Term of this Agreement, Contractor [Broadband] shall provide sufficient labor, transportation, tools and equipment necessary to perform all of the Work required by Company [CUI], and shall perform all such

Work in accordance with this Agreement, applicable Specifications and the Minimum Standards and Expectations. . . .

"Work" is defined as "the labor necessary to accomplish . . . the construction, installations, Audits, or Disconnects required by the Documents issued pursuant to this Agreement . . . ."

Section 12 requires Broadband to procure and maintain commercial general liability and excess liability insurance policies naming CUI as an additional insured on a primary, non-contributory basis, with per occurrence limits of at least $2 million:

**12. <u>Insurance</u>.**

(a) Contractor, unless otherwise specified by Company in writing, shall obtain and maintain throughout the term of this Agreement and cause any Sub-Contractor to obtain and maintain throughout the term of this Agreement valid insurance for all states in which it performs Work pursuant to this Agreement with coverage and limits as follows:

* * *

(ii) <u>Commercial General Liability Insurance</u>: Covering Operations and Premises Liability; Contractor's Protective Liability; Completed Operations; Product Liability; Contractual Liability; Personal Injury; Property Damage caused by explosion, collapse and underground damage; and Broad-Form Property Damage Endorsement. The limits of such liability insurance shall be no less than One Million Dollars ($1,000,000) combined single limit of liability for each occurrence and Two Million Dollars ($2,000,000) general aggregate annual limit;

* * *

(iv) <u>Umbrella Excess Liability</u>: Coverage in an amount no less than One Million Dollars ($1,000,000) for each occurrence.

(b) All insurance required herein shall be carried with known, well-established and reputable companies licensed to do business in the jurisdiction where the Work hereunder is to be performed, and such policies shall name Company and its agents, subsidiaries, parents, affiliates, directors, officers and their employees as additional insured parties with respect to the general liability and automobile policies. Contractor's insurance shall be primary and noncontributory.  . . .

Section 16 requires Broadband to indemnify CUI for personal injury claims arising from Broadband's negligence, including contractual indemnity obligations that CUI might owe to other third parties like Charter.

### 16. **Indemnification.**

In addition to any other indemnification obligations under this Agreement, Contractor shall indemnify and hold harmless, and at the Company's election defend, the Company and/or its predecessors, parents, agents, subsidiaries, successors or assigns and its and each of their partners, officers, shareholders, directors, officers, employees, and agents from and against:

\* \* \*

(b) Any and all claims, judgments, liabilities, damages, expenses, fines, losses, demands, actions, lawsuits, executions and costs (including but not limited to attorneys' fees and court costs) arising out of or in connection with any of the following:

\* \* \*

(iv) The negligence or other wrongdoing on the part of any employee, agent, servant or representative of Contractor or its Sub-Contractor(s);

\* \* \*

(vi) Any injury, damage or loss to persons (including injury to Contractor's employees and agents and the employees and agents of its Sub-Contractor(s) or material supplier) or property, including without limitation, the Company's property, occurring during, arising from or arising in connection with:

(A) the Work, including without limitation any defective, non-conforming or omitted Work; Contractor(s); or

(B) the entry upon or possession of Work site by Contractor or its Sub-Contractor(s); or

(C) the acts or omissions of Contractor, its Sub-Contractor(s) or the agents, employees, or invitees of Contractor or its Sub-Contractor(s) or any other person for whom Contractor or its Sub-Contractor(s) is responsible;

(vii) Any contractual indemnity obligation of the

Company to any third party arising out of the injuries, damages and losses specified in Section 16(b)(vi) above;

\* \* \*

(ix) Any claims by third parties for acts or omissions committed by Contractor or its Sub-Contractor(s) as an alleged agent of the Company, notwithstanding the agreement and understanding the [sic] neither Contractor nor its Sub-Contractor(s) is an agent or representative of the Company;

(x) The conduct of Contractor's business; . . .

### James Helderle

In November 2011, Broadband hired Robert Sebring as its facility manager in St. Louis, where Broadband was performing work for CUI. One of Sebring's duties was to interview and hire technicians. In the spring of 2012, Sebring became an employee of CUI, serving as asset manager and in-house administrator of CUI's St. Louis operations. However, Sebring continued to interview and hire technicians for Broadband. In October 2012, Sebring interviewed Helderle for a position performing installation and disconnection of Charter services. CUI ordered a background check and drug test through third parties. Helderle passed those screenings and was hired in late November 2012.

During a four-day trial in April 2019, the jury heard extensive evidence on the central factual dispute as to which company hired and employed Helderle. At the conclusion of the trial, two special interrogatories were submitted to the jury:

Have Plaintiffs proved by a preponderance of the evidence that, prior to his dismissal, James Helderle was an employee of (a) Broadband, or (b) both Broadband and Communications Unlimited.

ANSWER: Yes.

Have Plaintiffs proved by a preponderance of the evidence that, when Robert Sebring hired James Helderle, Sebring was acting on behalf of (a) Broadband, or (b) both Broadband and Communications Unlimited.

ANSWER: Yes.

8

The Court accepted the jury's findings as supported by the evidence presented at trial.[3] Thus, for purposes of resolving Plaintiffs' remaining legal claims, the Court adopts the jury's finding that Sebring hired Helderle as a Broadband employee at least in part, and Sebring was acting on behalf of Broadband at least in part when he did so.

### Underlying Lawsuit

On December 3, 2012, during his second week as a trainee, Helderle accompanied a CUI technician on a service call to the residence of Charter customer Jane Doe.  Helderle flirted with Doe and made her uncomfortable during the visit.  Afterward, he accessed her cell phone number and texted her to ask her out.  Doe, through a friend, contacted Charter to report Helderle's conduct.  The next day, Charter notified CUI of the complaint, and Helderle was dismissed.  The following night, Helderle returned to Doe's home where he violently and sexually assaulted her.

In September 2014, Doe filed a lawsuit in state court against Charter, CUI, Broadband, and Helderle (then incarcerated), alleging that the corporate defendants were Helderle's joint employers and asserting claims of negligent hiring, negligent supervision, and negligent failure to warn.  The petition alleged that the corporate defendants failed to check Helderle's references or social media, which would have revealed his unfitness to work in customers' homes.

### Insurance Policies

Four insurance policies potentially covered Doe's claims.  Travelers insured CUI under a Commercial General Liability (CGL) policy and a Commercial Umbrella Liability policy.  Mid-Continent insured Broadband under a CGL policy and a Commercial Excess policy.  Both

---

[3]     For example, the evidence included several personnel onboarding documents reflecting that Helderle was hired as employee of Broadband.  Those documents were sent to Broadband's accountant, who entered Helderle's W-4 information into Broadband's payroll system.  However, the evidence also demonstrated that Helderle was issued a work badge and technician number identifying him as a representative of CUI, and Helderle testified in deposition that he believed that he worked for CUI.

Travelers' and Mid-Continent's CGL policies provide indemnity for sums that the insured becomes legally obligated to pay as damages because of bodily injury caused by an "occurrence." ECF No. 128-8 at 13, 25. The policies also impose the duty to defend the insured in any civil action seeking damages because of bodily injury caused by an occurrence. Additionally, both policies insure against amounts in excess of a retained limit that the insured becomes legally obligated to pay because of bodily injury caused by an occurrence.

As relevant here, Mid-Continent's CGL policy contains an additional insured endorsement that extends Broadband's coverage to individuals or companies that Broadband has agreed to add as an additional insured:

### ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

#### SCHEDULE

**Name of Person or Organization:**

**Any person or organization for whom the named insured has agreed by written "insured contract" to designate as an additional insured subject to all provisions and limitations of this policy.**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**WHO IS AN INSURED (Section II)** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability caused, in whole or in part, by your performance of ongoing operations for that insured.

An "insured contract" includes:

That part of any other contract or agreement pertaining to your business … under which you assume the tort liability of another party to pay for "bodily injury" … to a third person or organization, provided the "bodily injury" … is caused, in whole or in part, by you or those acting on your behalf. Tort liability means a liability

10

that would be imposed by law in the absence of any contract or agreement.

Mid-Continent's excess policy similarly extends its coverage to "[a]ny person or organization qualifying as an **Insured** under any policy of **underlying insurance**." Here, the Mid-Continent CGL policy is the "underlying insurance."

Each of the policies also contains an "other insurance" provision that purports to determine whether that particular policy must pay before another applicable policy.  The "other insurance" provision in the Mid-Continent CGL policy states, in relevant part:

### 4. Other Insurance

If other valid and collectible other insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

### a. Primary Insurance

This insurance is primary except when Paragraph b. below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.***

### b. Excess Insurance

(1) This insurance is excess over:

* * *

(b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

* * *

The "other insurance" provision in the Mid-Continent Excess policy states, in relevant part:

### 10. Other Insurance

If other valid and collectible insurance is available to the insured for

**ultimate net loss**[4] we cover under this policy, our obligations under this policy are limited as follows:

> a. As this insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis, except such insurance as is specifically purchased to apply in excess of this policy's Limit of Insurance, we will indemnify only our share of the amount of **ultimate net loss**, if any, that exceeds the sum of:
>
> > (1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and
> >
> > (2) The total of all deductible and self-Insured amounts under this or any other insurance.

The "other insurance" provision in the Travelers CGL policy states, in relevant part:

> **4. Other Insurance**
>
> If valid and collectible other insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as described in Paragraphs **a.** and **b.** below.
>
> As used anywhere in this Coverage Part, other insurance means insurance, or the funding of losses, that is provided by, through or on behalf of:
>
> i) Another insurance company;
>
> * * *
>
> **a. Primary Insurance**
>
> This insurance is primary except when **b.** below applies.***
>
> **b. Excess Insurance**
>
> * * *
>
> When this insurance is excess, we will have no duty under Coverage A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we

---

[4] "Ultimate net loss" is defined, in relevant part, in the Mid-Continent Excess policy as "the total amount of damages for which the insured is legally liable in payment of bodily injury . . . ."

will be entitled to the insured's rights against all those other insurers.

When this insurance is excess, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

> (1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

> (2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in the Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis, that is available to the insured when the insured is added as an additional insured under any other policy, including any umbrella or excess policy.

* * *

The "other insurance" provision in the Travelers Umbrella policy states, in relevant part:

**L. Other Insurance**

If **Other Insurance** applies to damages that are also covered by this policy, this policy will apply excess of and shall not contribute with, that **Other Insurance**, whether it is primary, excess, contingent or on any other basis. However, this provision will not apply if the **Other Insurance** is specifically written to be excess of this policy.

### Travelers' Tenders to Mid-Continent

Travelers tendered Doe's claims to Mid-Continent three times.  In July 2014, Travelers notified Mid-Continent of Doe's pre-suit demand and asserted CUI's right to defense and indemnity based on the indemnification provision in the MSA and the additional insured endorsement in the Mid-Continent CGL policy.  Mid-Continent refused on the basis that Doe's injuries were not caused in any way by Broadband's "ongoing operations," as required by the additional insured endorsement.

In October 2014, shortly after Doe filed her petition, Travelers made a second tender noting that CUI's liability did indeed arise from Broadband's ongoing operations in that Doe's claims alleged negligent acts and omissions in Helderle's hiring, supervision, and dismissal. Again, Mid-Continent declined.

In November 2015, Travelers sent a third tender letter offering Mid-Continent a final opportunity to assume control of the Doe litigation by defending CUI and Charter without reservation.  Mid-Continent again refused.  According to Mid-Continent, Broadband was not obligated to indemnify CUI under the MSA because Helderle had already been terminated when he attacked Doe and, moreover, it was CUI's role to perform background checks on prospective technicians.  Mid-Continent asserted that Doe's injuries therefore did not arise out of Broadband's "work" under the MSA or "ongoing operations" under the policy, so coverage was not available to CUI as an additional insured.

Based on the tender correspondence in the record, the Court finds that Mid-Continent had ample opportunity to control and manage the underlying action and chose not to because it believed that its policies did not cover Doe's claims.

### Doe Settlement

On January 20, 2016, Plaintiffs entered into a settlement agreement with Jane Doe for $1,650,000 in exchange for a full release of CUI and Charter and her dismissal with prejudice of the claims asserted against them in the underlying action.  Of that amount, Travelers paid $1,500,000, and CUI paid $150,000.  The agreement specifically preserved Doe's claims against Broadband.

The settlement agreement makes no allocation of amounts paid to obtain the separate release of Charter. Although Mid-Continent stipulated that the settlement with Doe was

14

reasonable, Mid-Continent contends that the Court should determine an allocation as between CUI and Charter because Mid-Continent's policies do not cover any amounts paid on Charter's behalf.

The Court received extensive testimony on Plaintiffs' intent in negotiating and executing the settlement.  CUI presented credible testimony about its assessment of Charter's potential liability to Doe.  CUI's in-house counsel, Ron Kent, who participated in negotiations and authorized the settlement, emphasized that Charter had nothing to do with the hiring, onboarding, training, or supervision of technicians, which was CUI's responsibility and, in the case of Helderle, delegated to Broadband.  Based on CUI's view that Charter had no control over and was not responsible for the conduct that led to Doe's injuries, CUI assigned zero percent fault to Charter at the time of the settlement.

Travelers, too, presented credible testimony that it entered into the settlement agreement believing that Charter had no exposure.  Travelers' claim representative on the Doe matter, Dan Leach, likened the relationship between Charter, CUI, and Broadband to a construction relationship between owner, contractor, subcontractor.  Leach explained that, through the indemnification provisions in the MCA and MSA, risk was transferred from Charter to CUI to Broadband, whose risk was insured by Mid-Continent's policies as required by the MSA.  When Mid-Continent refused Travelers' tender, Leach took action to protect CUI as Travelers' named insured and Charter as its additional insured.  Despite the allegations against Charter in Doe's petition, Leach viewed Charter as merely the end customer having no involvement in the conduct leading to Doe's injury.

Leach testified that Travelers valued Doe's claim at $1.5 million and that he was authorized to offer up to that amount.  While Doe was unwilling to accept $1.5 million, Leach

and Kent came to believe that she would likely accept $1.65 million.  Motivated to settle the case, CUI agreed to pay the $150,000 difference.  Though Travelers opened two separate claim files with separate claim numbers for CUI and Charter, respectively, Travelers allocated one hundred percent of its $1,500,000 payment to the claim file for CUI and did not allocate any portion of its payment to the claim file for Charter.  Travelers assessed Charter's fault at zero percent.

Based on the foregoing testimony, the Court finds that Plaintiffs attributed no liability to Charter in the settlement even though the release of Charter, as CUI's customer, was an essential component of the settlement.  Plaintiffs explicitly informed Mid-Continent in tender correspondence that they sought to resolve Doe's claims against both CUI *and* Charter.  ECF No. 111-14.  Mid-Continent's response lacked any inquiry or request with respect to allocation to Charter.  ECF No. 111-15.

### Travelers' Payment of Defense Costs

In addition to funding $1.5 million of the settlement payment to Jane Doe, Travelers paid $66,884.67 to defend CUI and $34,190.61 to defend Charter in the underlying action. Given the nature of the underlying action and the result obtained, and considering the rates customarily charged in St. Louis, the Court finds that these fees were reasonable.

CUI also incurred its own attorney fees in the amount of $2,487.50.  CUI engaged in settlement negotiations during the underlying action and was aware that it might be required to contribute to any settlement sum offered by Travelers.  Prior to mediation in the underlying action, CUI retained independent counsel to provide advice related to its defenses and exposure and to assist during settlement negotiations. Given the nature of the underlying action and the result obtained, the Court likewise finds that these fees were reasonable.

## CONCLUSIONS OF LAW

Given the dismissal of Count I against Broadband at an earlier stage of the case, Plaintiffs' remaining claims against Mid-Continent comprise two counts.  In Count II, CUI seeks indemnification of the $150,000 it paid to Jane Doe, plus $2,487.50 in defense costs incurred in the underlying action.  For Count III, Travelers seeks equitable contribution and indemnification for the $1.5 million it paid to Jane Doe plus $113,120.82 in defense costs.  Plaintiffs also seek pre-judgment interest.  The parties agree that Plaintiffs' claims depend on whether the MSA is an "insured contract" and CUI is an "insured" under the Mid-Continent policies, applied to the present facts.  The parties also agree that Alabama law governs the MSA and Missouri law governs the insurance policies.

### I.       CUI was an additional insured.

Broadband's CGL and umbrella excess policies with Mid-Continent define "insured contract" and "insured" as follows:

> Insured contract:  That part of any other contract or agreement pertaining to your business … under which you assume the tort liability of another party to pay for "bodily injury" … to a third person … provided the bodily injury is ***caused in whole or in part* by you or by those acting on your behalf**.  (emphasis added)

> "Who is an insured" is amended to include as an insured the person or organization shown in the Schedule, but **only with respect to liability caused in whole or in part by your performance of *ongoing operations* for that insured**.  (emphasis added)

Mid-Continent maintains that its coverage does not apply to CUI's liability to Doe because Helderle's assault was entirely outside the scope of Broadband's "ongoing operations." CUI counters that its liability to Doe was indeed caused by Broadband's operations, specifically in the form of Sebring's hiring of Helderle.  The Court agrees with CUI.  The fact that Helderle was no longer a Broadband employee when he assaulted Doe is irrelevant.  Doe's claims against

17

the corporate defendants alleged negligent hiring and supervision.  These functions were within
Broadband's duties under the MSA and are encompassed in the indemnification clause.  The
MSA states in pertinent part:

> Section 6.  Contractor's [Broadband's] Duties
>
> (a)  Contractor agrees to furnish at all times an adequate supply of workers…
>
> (f)  Contractor shall furnish the sole supervision and control of any labor
> necessary to perform the work…
>
> (h)  Contractor acknowledges that its employees … may be dealing directly with
> the Company's [CUI's] customers…  Accordingly, Contractor agrees … to use
> and/or subcontract only with persons suitable for work in a public environment
> and shall ensure that its employees… shall not engage in actions which may
> detrimentally affect the Company or its reputation.

A jury found that CUI's asset manager, Robert Sebring, was acting on behalf of
Broadband or both Broadband and CUI when he hired Helderle, and that Helderle was an
employee of Broadband or both companies.  In other words, Sebring was acting at least in part
on behalf of Broadband and not solely on behalf of CUI.  Thus, to the extent Broadband was at
least partially responsible for Helderle's hiring and supervision, Broadband assumed that
responsibility pursuant to the foregoing provisions of the MSA.  Notably, the MSA explicitly
places on Broadband the duty to ensure that its employees are fit to work with the public in a
manner that upholds CUI's reputation.  These duties are separate from CUI's role running
criminal background checks, stated elsewhere in the MSA.[5]  Sebring personally interviewed
Helderle and offered him a job without contacting his references or performing a simple internet

---

[5]     Plaintiffs also argue that the MSA obligates Broadband to indemnify CUI even for CUI's
own negligence.  The Court rejected this theory on summary judgment because the MSA states
that neither party shall be responsible for any act or omission of the other or any employee of the
other.  ECF No. 144 at 16; ECF No. 141-1 at 33.  CUI's liability is not at issue here, and the
Court need not apportion fault in the present coverage case.  Doe claimed that Broadband, CUI,
and Charter were Helderle's joint employers.  Mid-Continent does not dispute that, to the extent
Helderle was a Broadband employee, the MSA governs its relationship with CUI.

search.  These are the acts and omissions that Doe claimed caused her injuries as attributable to

Helderle's employers, and Broadband agreed to indemnify CUI for this type of claim under

numerous provisions of the MSA:

<u>Section 16.  Indemnification</u>

In addition to any other indemnification obligations under this Agreement,
Contractor shall indemnify and hold harmless, and at the Company's election
defend, the Company and/or its predecessors, parents, agents, subsidiaries,
successors or assigns and its and each of their partners, officers, shareholders,
directors, officers [sic], employees, and agents from and against: [...]

 (b) Any and all claims, judgments, liabilities, damages, expenses, fines, losses,
demands, actions, lawsuits, executions and costs (including but not limited to
attorneys' fees and court costs) *arising out of or in connection with* any of the
following:

> (ii) Any breach by Contractor or its Sub-Contractor(s) of the terms of the
> Documents;
>
> (iv) The negligence or other wrongdoing on the part of any employee,
> agent, servant, or representative of Contractor or its Sub-Contractor(s);
> [...]
>
> (vi) Any injury, damage or loss to persons ... occurring during, arising
> from or arising in connection with: [...]
>
>> (A) the Work, including without limitation any defective, non-
>> conforming or omitted Work;
>>
>> (B) the entry upon or possession of Work site by Contractor or its
>> Sub-Contractor(s);
>>
>> (C) the acts or omissions of Contractor, its Sub-Contractor(s) or
>> the agents, employees, or invitees of Contractor or its Sub-
>> Contractor(s) or any other person for whom Contractor or its Sub-
>> Contractor(s) is responsible;
>
> (vii) Any contractual indemnity obligation of the Company to any third
> party arising out of the injuries, damages and losses specified in [(b)(vi)];
> [...]
>
> (ix) Any claims by third parties for acts or omissions committed by
> Contractor or its Sub-Contractor(s) as an alleged agent of the Company,
> notwithstanding the agreement and understanding the [sic] neither

Contractor nor its Sub-Contractor(s) is an agent or representative of the Company.

(x) The conduct of Contractor's business; …

Broadband was contractually obligated to provide indemnification to CUI under each of these clauses of the MSA for the claims asserted by Doe.  Based on the foregoing language, the Court concludes that the MSA is an "insured contract" as that term is defined in Mid-Continent's policies.

The Court also concludes that CUI is an "insured" under the policies because its liability to Doe stems at least in part from Broadband's "ongoing operations."  Again here, Mid-Continent insists that CUI's liability to Doe had nothing to do with Broadband's work for CUI; rather, Helderle's assault was an intervening criminal act by a former employee outside the scope of employment.  But, as previously stated, Mid-Continent's emphasis on Helderle's actions overlooks the nature of Doe's claims against the corporate defendants in the underlying suit.  Those claims focus on acts and omissions in the hiring and supervision of Helderle as a cable technician for Charter's customers.

Although neither the Missouri Supreme Court nor the Eighth Circuit has opined on the meaning of "ongoing operations," other appellate authorities logically instruct that it means "simply those things that the company does."  *Marathon Ashland Pipe Line LLC v. Maryland Cas. Co.*, 243 F.3d 1232, 1238 (10th Cir. 2001).  Consistent with this plain interpretation, this district has looked to the terms of the contract between the insured and the additional insured to determine whether an accident arose out of the insured's ongoing operations.  *See e.g., Commerce Bancshares, Inc. v. Am. Family Mut. Ins. Co.*, 4:14CV1562 JCH, 2016 WL 1161595, at *4 (E.D. Mo. Mar. 23, 2016) (finding that the injury arose from the insured's property maintenance duties even though the insured was not performing them at the time of the

20

accident).  In the present case, the hiring and supervision of technicians were typical operations

that Broadband performed for CUI on an ongoing basis pursuant to the MSA.  CUI's liability to

Doe was caused at least in part by Broadband's performance of those operations.  The Court thus

concludes that CUI is entitled to coverage under Mid-Continent's policies.

## II.    Mid-Continent's Breach (Count II)

Count II of Plaintiffs' complaint consists of CUI's claim against Mid-Continent for

breach of contract, specifically for Mid-Continent's refusal to defend and indemnify CUI in the

underlying Doe suit.  CUI seeks to recover the $150,000 it paid to Jane Doe, plus $2,487.50 in

defense costs.

Under Missouri law, "[a]n insurer owes two distinct duties to its insured: a duty to

indemnify and a duty to defend." *Allen v. Cont'l W. Ins. Co.*, 436 S.W.3d 548, 552 (Mo. 2014).

The duty to defend is "broader than its duty to indemnify" and arises "when there is a potential

or possible liability to pay based on the facts at the outset of the case."  *Id.*  "In determining

whether an insurer has a duty to defend, the Court first compares the policy language with the

allegations in the petition from the underlying lawsuit.  If the underlying petition alleges facts

that give rise to a claim potentially covered by the policy, the insurer has a duty to defend."

*Amerisure Mut. Ins. Co. v. Fed. Ins. Co.*, No. 4:15-CV-509-SPM, 2016 WL 1721124, at *8 (E.D.

Mo. Apr. 29, 2016) (citing *Allen*, 436 S.W.3d at 552).  "An insurance company has

a duty to defend an insured when the insured is exposed to ***potential*** liability to pay based on the

facts known at the outset of the case, no matter how unlikely it is that the insured will be found

liable and whether or not the insured is ultimately found liable."  *Truck Ins. Exch. v. Prairie*

*Framing, LLC*, 162 S.W.3d 64, 79 (Mo. App. W.D. 2005) (emphasis in original).  "To extricate

itself from a duty to defend the insured, the insurance company must prove that there is ***no possibility*** of coverage." *Id.* (emphasis in original).

Mid-Continent's policy states:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" . . . to which this insurance applies. We will have the right and *duty to defend* the insured against any "suit" seeking those damages. . . .

ECF No. 128-8 at 13.  Mid-Continent's coverage applies to bodily injury caused by an "occurrence," including accidents.  *Id*. at 25.  Under Missouri law, "when a liability policy defines occurrence as meaning accident, Missouri courts consider this to mean injury caused by the negligence of the insured."  *Assurance Co. of Am. v. Secura Ins. Co.*, 384 S.W.3d 224, 235 (Mo. App. E.D. 2012).  Here, Doe's petition clearly alleges negligent acts and omissions giving rise to a claim against CUI *potentially* covered by Mid-Continent's policy, so Mid-Continent had a duty to defend CUI in the underlying suit.

When an insurer refuses to defend a covered insured, it is liable to the limits of its policy plus attorney fees, expenses, and other damages.  *Allen v. Bryers*, 512 S.W.3d 17, 38 (Mo. 2016).  "This is true even though the company acts in good faith and has reasonable grounds to believe there is no coverage under the policy."  *Id.* at 39.  Missouri precedent, which the parties agree governs interpretation of the policies, further instructs:

> When an insurer refuses to defend, the insured is free to go its own way and make a reasonable settlement or compromise without losing the right to recover on the policy. … This is because an insurer who relinquishes the right to control the defense of the claim against the insured no longer has any direct and protectible interest in the suit against the insured.
>
> The legal effect of the insurer's unjustified refusal to defend a claim . . . is a breach of contract. It is a breach that relieves the insured of the contractual obligation not to settle without the consent of the insurer without the loss of the right to recover on the policy. For such breach of contract, the insured is released from the policy

> prohibition against incurring expenses and negotiating and settling claims, and the insurer is thus obligated to reimburse the insured for such settlement, absent collusion.  An insurer cannot have its cake and eat it too by both refusing coverage and at the same time continuing to control the terms of settlement in defense of an action it had refused to defend.

*Stark Liquidation Co. v. Florists' Mut. Ins. Co.*, 243 S.W.3d 385, 399 (Mo. App. E.D. 2007) (cleaned up).

The duty to indemnify turns on whether the claim is *actually* covered by the policy." *Am. Econ. Ins. Co. v. Jackson*, 476 F.3d 620, 624 (8th Cir. 2007) (emphasis in original) (applying Missouri law).  In order to determine whether an insurer is obligated to indemnify its insured, courts must look to the "facts as they are established at trial or as they are finally determined by some other means, for example through summary judgment or settlement." *McCormack Baron Mgmt. Servs., Inc. v. Am. Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 173 (Mo. 1999).  Again, here, Doe asserted that the corporate defendants were joint employers who negligently hired and supervised Helderle and failed to warn her of potential danger following his termination.  The Court concludes that the MSA was an "insured contract" and CUI was an "insured" with respect to Doe's claims, all of which were settled without limitation as to particular allegations or allocation.

> Following a settlement as to which the insurer denies coverage, the existence of coverage should depend on what claims were settled; that is, it should depend on why the money was paid. The actual merit of each of the plaintiff's claims against the insured is not directly relevant. The only question should be how the parties to the settlement viewed the relative merits of the plaintiff's claims at the time of the settlement and whether, if the insured settled without the carrier's approval, the settlement amount was reasonable. Neither the insurer nor the insured should be allowed to try the plaintiff's claim in the coverage suit.

Allan D. Windt, *Insurance Claims and Disputes* § 6:31 nn. 6-9 (6th ed.).

The Court concludes that Mid-Continent breached its policy by refusing to defend CUI in the underlying Doe suit.  Consequently, CUI is entitled to recover its defense costs and full indemnification for its contribution toward the Doe settlement.  Further, Mid-Continent is not entitled to a reduction for any portion paid on behalf of Charter.  Plaintiffs were entitled to negotiate a settlement that encompassed the release of Charter in the context of CUI's indemnification obligation to Charter under the MCA.  Mid-Continent concedes that the settlement was reasonable.  It is not the role of this Court to try the merits of Doe's respective claims against CUI and Charter here.  Plaintiffs presented credible testimony that they evaluated Charter's contribution at zero.  Judgment will be entered for CUI on Count II.

### III.     Equitable Contribution (Count III)

For Count III, Travelers seeks equitable contribution and indemnification from Mid-Continent for $1.5 million in damages paid to Jane Doe, plus $113,120.82 in defense costs.

Equitable contribution lies when several insurers are obligated to indemnify the same loss and one insurer has paid more than its share of the loss.  *Heartland Payment Sys., L.L.C. v. Utica Mut. Ins. Co.*, 185 S.W.3d 225, 232 (Mo. App. E.D. 2006).  To give rise to a right of contribution on the ground of concurrent insurance, the insurance provided must cover the same insured, the same interest, and the same risk. *Id.*  Such is the case here. The policies issued by Travelers and Mid-Continent cover the same insured: CUI.  They both cover the same interest, specifically CUI's liability to third parties.  And they cover the same risk of exposure created by CUI's provision of field labor services for cable providers, in this case delegated to Broadband.  Thus, the only issue for the Court to resolve is the priority of coverage.

Mid-Continent does not dispute that its primary policy would apply first but argues that Travelers's primary policy should apply next, before Mid-Continent's excess policy.  Relying on

cases from other jurisdictions, Mid-Continent suggests that its policy language controls, not Broadband's obligation under the MSA.  In one of those cases, the court reasoned that the insurer could not be bound by the insured's contract without consent.  *Travelers Ins. Cos. v. Dickey*, 799 P.2d 625 (Okla. 1990).  Here, however, Mid-Continent consented by issuing the policy to Broadband specifically for the MSA, with CUI named as an additional insured.

"It is the parties' rights and liabilities to each other which determine the insurance coverage; the insurance coverage does not define the parties' rights and liabilities one to the other."  *Fed. Ins. Co. v. Gulf Ins. Co.*, 162 S.W.3d 160, 165 (Mo. App. E.D. 2005).  "Courts should consider obligations under an indemnity agreement before allocating responsibility for the settlement liability according to the terms of the relevant policies."  *Id*.  An "indemnity agreement between the insureds, or a contract with an indemnification clause ... may shift an entire loss to a particular insurer notwithstanding the existence of an 'other insurance' clause in its policy."  *Amerisure Mut. Ins. Co.*, 2016 WL 1721124, at *11.  *See also Auto Owners Ins. Co. v. Biegel Refrigeration & Elec. Co.*, 659 F. Supp. 2d 1050, 1055 (E.D. Mo. 2009) (noting that contractual indemnity agreements are to be enforced even over an "other insurance" clause in an insurance policy).

The Eighth Circuit similarly has held that the indemnity agreement is paramount in determining allocation, particularly when the agreement *requires* the insurance, as is the case here, and notwithstanding "primary" or "excess" status.

> Whether the parties are termed "primary" or "excess" depends on who is required to pay first, and that is the question presented here. The answer to this question, however, depends on the indemnity agreement because of its effect on the obligations of the parties. In this situation, RLI cannot avoid liability for the settlement by pointing to language in its policy calling itself "excess."  RLI is "excess" to National Union only if we determine that National Union is liable first, and, as explained above, we do not do so because we believe the indemnity agreement governs.

*Wal-Mart Stores, Inc. v. RLI Ins. Co.*, 292 F.3d 583, 590 (8th Cir. 2002).

Here, the indemnification clause in the MSA reflects the parties' relationship and their intentions with respect to allocating risk.  Broadband agreed to defend, indemnify, and hold harmless CUI against any claims that arose from Broadband's negligence.  Jane Doe's claims of negligent hiring and supervision are precisely the sort of risk that Broadband assumed and agreed to insure on a primary and non-contributory basis under the MSA.  Mid-Continent issued the policies naming CUI as an additional insured.  On these facts, invoking Travelers' policies to reduce Mid-Continent's liability would abrogate the indemnity agreement.  *Federal Ins. Co.*, 162 S.W.3d at 165.

The precedent discussed above directs that the MSA indemnification clause controls and shifts primary liability to Mid-Continent to exhaust both its policies before Travelers' coverage would apply.[6]  The Court therefore concludes that Mid-Continent must reimburse Travelers for the entire $1.5 million of the Doe settlement as well as $66,884.67 in costs incurred defending CUI in the underlying suit, up to the limit of its CGL and umbrella excess policies.

<u>Defense of Charter</u>

Travelers asserts that it is also entitled to recover $34,190.61 in defense costs attributable to Charter under the "supplementary payments" provision of the Mid-Continent policy.  That provision states that Mid-Continent will defend an insured's indemnitee in the same suit if, as pertinent here, (1) the suit seeks damages for liability that the insured has assumed under an "insured contract"; (2) the insurance applies to such liability; (3) the insured assumed the

---

[6]    Mid-Continent attempts to argue that the parties' stipulation dismissing Broadband removes the MSA indemnification clause from the case such that Plaintiffs can only recover based on Mid-Continent's policy language, as if the MSA never existed. This makes no sense and is inconsistent with the intent of the parties as represented to the Court at the time of the dismissal of Count I.  Broadband obtained the policies specifically as a requirement of the MSA, and the dismissal explicitly stated that it had no preclusive effect on the remaining claims.

obligation to defend the indemnitee in the insured contract; and (4) the insured and the indemnitee tendered the suit to Mid-Continent.  ECF No. 128-8 at 20.

Broadband's indemnification obligation under the MSA expressly included CUI's contractual indemnity obligation to third parties arising out of injuries, damages, and losses stemming from Broadband's acts or omissions.  ECF No. 141-1 at 28-29, ¶ 16(b)(vii).  Having established that CUI is an "insured" for purposes of the Doe suit, Travelers further asserts here that the MCA between CUI and Charter is an "insured contract" satisfying the supplementary payments provision of the Mid-Continent policy.  The Court is not persuaded that Mid-Continent's coverage extends so far upstream.

The policy defines "insured contract" as one "under which *you* assume the tort liability of another party to pay for 'bodily injury' … caused, in whole or in part, by *you* …"  And, importantly, "you" is defined as the *named* insured.  ECF No. 128-8 at 13.  Thus, according to the plain language of the policy, "insured contract" is one in which the named insured (i.e., Broadband) agrees to indemnify the additional insured (i.e., CUI).  The MCA between CUI and Charter is not an "insured contract" as defined in the policy.  Consequently, Mid-Continent's policy does not appear to provide coverage for Charter's defense costs as supplementary payments.  Plaintiffs have not supplied authority or analysis to convince the Court otherwise.

## IV.    Prejudgment Interest

The purpose of statutory prejudgment interest is to promote settlement of lawsuits and fully compensate plaintiffs by accounting for the time-value of money.  *Doe Run Res. Corp. v. Certain Underwriters at Lloyd's London*, 400 S.W.3d 463, 477 (Mo. App. E.D. 2013).  In this diversity action, Missouri's prejudgment interest statute applies and provides that, when no other rate is agreed upon, creditors shall be allowed to receive interest at the rate of nine percent per

annum.  Mo. Rev. Stat. § 408.020.  When it applies, § 408.020 is not discretionary; the Court

must award pre-judgment interest.  *Assurance Gen. Contracting, LLC v. Ekramuddin*, 604

S.W.3d 761, 772 (Mo. App. E.D. 2020).  "According to this statute, parties with outstanding

accounts are entitled to pre-judgment interest of nine percent if the amount owed is liquidated or

readily ascertainable and a demand for payment, definite as to both time and amount, has been

made on the debtor party."  *Id.*

      Generally, the filing of a lawsuit constitutes a demand.  *Nelson v. Farm Bureau Town &*

*Country Ins. Co. of Missouri*, 560 S.W.3d 81, 93 (Mo. App. W.D. 2018).  Accordingly, Plaintiffs

seek pre-judgment interest accruing since the date of their complaint, filed on April 13, 2016.

Mid-Continent counters that the amount of the claim has never been ascertainable because

Plaintiffs never indicated what portion of the settlement was attributable to CUI (thus potentially

covered) separate from Charter.  In taking this position, Mid-Continent implies that pre-judgment

interest cannot accrue until the Court resolves the matter of allocation.  Aside from the fact that

the Court finds the entire settlement attributable to CUI, the "mere fact that a party denies

liability or defends a claim against him, or even the existence of a bona fide dispute as to the

amount of the indebtedness, does not preclude recovery of interest."  *Scott v. King*, 510 S.W.3d

887, 894 (Mo. App. E.D. 2017).  Damages may still be ascertainable even when there is a

dispute over the actual monetary value of the award.  *Id.*  "Holding otherwise would allow a

defending party to avoid prejudgment interest simply by disputing liability, and liability is

disputed in almost every case."  *Id.* at 895.  Thus, the accrual of pre-judgment interest was never

dependent on an allocation of the settlement as between CUI and Charter.  The amount was

ascertainable.

Alternatively, however, Mid-Continent also argues that interest should start to accrue only after June 29, 2017, when Plaintiffs disclosed the precise amount of the Doe settlement during discovery in this case.  The Court agrees.  The complaint itself did not reveal the amount, and Plaintiffs refused to disclose it until a protective order was in place to ensure confidentiality for Jane Doe.  ECF No. 237, Exhibits 3-6.  Under Missouri law, a demand must be definite in amount. *Nusbaum v. City of Kansas City*, 100 S.W.3d 101, 109 (Mo. 2003).  "Prejudgment interest is generally not warranted when the debtor is unaware of the amount owed." *Id*.  *See also Monsanto Co. v. Gould Elecs., Inc.*, 965 S.W.2d 314, 318 (Mo. App. E.D. 1998) (allowing interest only from the time invoices were submitted, where pleadings did not specify amount). The Court therefore concludes that pre-judgment interest began to accrue only once Plaintiffs perfected their demand by specifying the amount of the claim, notwithstanding Plaintiffs' good faith reason for delay.

The Court will award simple pre-judgment interest of nine percent per annum beginning June 29, 2017.

## V.   Counterclaim Expenses

Finally, Plaintiffs assert that the MSA obligates Broadband (hence Mid-Continent) to indemnify CUI for its attorney fees and expenses incurred in litigating Mid-Continent's unsuccessful counterclaim for contribution.  Mid-Continent counters that the American Rule should apply here because there is no statutory or contractual basis for fee-shifting, nor are there special circumstances warranting an award. *See e.g., CM Vantage Specialty Ins. Co. v. Nephrite Fund 1, LLC*, 4:18 CV 1749 JMB, 2020 WL 3972014, at *2 (E.D. Mo. July 14, 2020) (describing special circumstances justifying an award of attorney fees in declaratory judgment actions involving insurance coverage disputes).

The Court does not find any basis for an award of fees here.  While the MSA covers fees and expenses from the underlying Doe case, it contains no fee-shifting provision with respect to enforcement litigation.  Plaintiffs cite no authority for their position that they are entitled to recover fees from the present case.  Under Missouri law, such an award requires a showing of special circumstances, and Plaintiffs have made no such demonstration.

**CONCLUSION**

Mid-Continent's policy covers CUI's loss in the defense and settlement of Doe's claims because Broadband's hiring and supervision of Helderle was part of Broadband's "ongoing operations" for CUI under the MSA.  On Count II, CUI is entitled to recover its settlement payment of $150,000 plus defense costs of $2,487.50

Under applicable Missouri and Eighth Circuit precedent, the MSA shifts liability to Mid-Continent such that both of its policies are primary to Travelers' policy covering the same loss. Therefore, on Count III, Travelers is entitled to recover the entirety of its settlement payment of $1.5 million, none of which is attributable to Charter, plus defense costs of $66,884.67 in defending CUI only.

Plaintiffs are entitled to pre-judgment interest from the time of disclosure of the amount of the settlement on June 29, 2017.

A Judgment will issue separately.


_Audrey G. Fleissig_
_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 1st day of September 2021.